**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

_____
                                                   )
THE JAMES MADISON PROJECT, *et al.*,  )
                                                   )
                         Plaintiffs,          )
                                                   )
                         v.                   )          Civil Action No. 1:17-cv-01231 (ABJ)
                                                   )
CENTRAL INTELLIGENCE          )
AGENCY, *et al.*,                          )
                                                   )
                         Defendants.        )
_____ )


**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR PARTIAL
SUMMARY JUDGMENT AND DEFENDANTS' CROSS-MOTION FOR
PARTIAL SUMMARY JUDGEMENT**


CHAD A. READLER
Acting Assistant Attorney General

MARCIA BERMAN
Assistant Director, Federal Programs Branch

STEPHEN M. ELLIOTT
Trial Attorney
United States Department of Justice
Civil Division, Federal Programs Branch
20 Massachusetts Avenue, N.W., Room 7318
Washington, D.C. 20530
Tel: (202) 305-8177
Email: stephen.elliott@usdoj.gov

*Counsel for Defendants*

### TABLE OF CONTENTS

INTRODUCTION ............................................................................................................... 1

BACKGROUND ................................................................................................................. 2

ARGUMENT ...................................................................................................................... 3

   I.   STATUTORY STANDARDS................................................................................ 3

      A.  The Freedom of Information Act ................................................................. 3

      B.  Special Considerations in National Security Cases......................................... 5

  II.  DEFENDANTS PROPERLY DECLINED TO CONFIRM OR DENY THE
       EXISTENCE OR NONEXISTENCE OF RECORDS RESPONSIVE TO
       PLAINTIFFS' FOIA REQUESTS ...................................................................... 7

      A.  Defendants Correctly Invoked Their Glomar Responses under FOIA Exemption 1....... 8

         1.  The NSA's Glomar response protects classified information. ..................................... 9

         2.  The CIA's Glomar response protects classified information. ................................... 12

         3.  The FBI's Glomar response protects classified information. ................................... 14

      B.  Defendants Properly Invoked Their Glomar Responses under FOIA Exemption 3 ...... 16

         1.  The NSA's Glomar response shields statutorily-protected information ................... 17

         2.  The CIA's Glomar response shields statutorily-protected information...................... 19

         3.  The FBI's Glomar response shields statutorily-protected information. ..................... 20

      C.  The FBI Correctly Invoked Its Glomar Response under FOIA Exemption 7................ 20

         1.  The FBI's Glomar response protects law enforcement sensitive information under
            FOIA Exemption 7(A). ............................................................................... 21

         2.  The FBI's Glomar response protects law enforcement sensitive information under
            FOIA Exemption 7(E). ............................................................................... 22

 III.  THE GOVERNMENT HAS NOT OFFICIALLY ACKNOWLEDGED THE
       CLASSIFIED, STATUTORILY PROTECTED, AND LAW ENFORCEMENT
       SENSITIVE INFORMATION PROTECTED BY THE
       GLOMAR RESPONSES ................................................................................ 25

CONCLUSION.................................................................................................................. 30

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*ACLU v. Dep't of Def.,*
    628 F.3d 612 (D.C. Cir. 2011) ................................................................ 6, 18, 19, 20

*ACLU v. CIA,*
    710 F.3d 422 (D.C. Cir. 2014) ...................................................................... 25, 26, 29

*Afshar v. Dep't of State,*
    702 F.2d 1125 (D.C. Cir. 1983) .......................................................................... 7, 25, 28

*Albuquerque Publ'g Co. v. U.S. Dep't of Justice,*
    726 F. Supp. 851 (D.D.C. 1989) ............................................................................ 24

*Allard K. Lowen Fischer Int'l Human Rights Project v. DHS,*
    626 F.3d 678 (2d Cir. 2010) ................................................................................... 23

*Ass'n of Retired R.R. Workers, Inc. v. U.S. R.R. Ret. Bd.,*
    830 F.2d 331 (D.C. Cir. 1987) ................................................................................ 5

*Barnard v. DHS,*
    598 F. Supp. 2d 1 (D.D.C. 2009) ........................................................................... 24

*Benjamin v. U.S. Dep't of State,*
    178 F. Supp. 3d 1 (D.D.C. 2016) ......................................................................... 6, 9

*CIA v. Sims,*
    471 U.S. 159 (1985) ................................................................................... 4, 16, 19

*Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Justice,*
    746 F.3d 1082 (D.C. Cir. 2014) ........................................................................ 21, 22

*Ctr. for Nat'l Sec. Studies v. Dep't of Justice,*
    331 F.3d 918 (D.C. Cir. 2003) ......................................................................... 4, 5, 6

*DiBacco v. U.S. Army,*
    795 F.3d 178 (D.C. Cir. 2015) ............................................................................... 5

*Durrani v. U.S. Dep't of Justice,*
    607 F. Supp. 2d 77 (D.D.C. 2009) ........................................................................ 23

*Fitzgibbon v. CIA,*
    911 F.2d 755 (D.C. Cir. 1990) .......................................................................... 6, 9

*Frugone v. CIA,*
    169 F.3d 772 (D.C. Cir. 1999) ...................................................................... 6, 7, 11

*Gardels v. CIA*,
 689 F.2d 1100 (D.C. Cir. 1982) ....................................................................... 7, 16

*Halperin v. CIA*,
 629 F.2d 144 (D.C. Cir. 1980) ............................................................................. 19

*Hamdan v. Dep't of Justice*,
 797 F.3d 759 (9th Cir. 2015) ................................................................................ 17

*John Doe Agency v. John Doe Corp.*,
 493 U.S. 146 (1989) .......................................................................................... 4, 5

*Judicial Watch, Inc. v. Dep't of Def.*,
 715 F.3d 937 (D.C. Cir. 2013) ............................................................................... 9

*Judicial Watch, Inc. v. U.S. Dep't of Commerce*,
 337 F. Supp. 2d 146 (D.D.C. 2004) ...................................................................... 24

*King v. Dep't of Justice*,
 830 F.2d 210 (D.C. Cir. 1987) ........................................................................ 5, 6, 9

*Kissinger v. Reporters Comm. for Freedom of the Press*,
 445 U.S. 136 (1980) .............................................................................................. 5

*Larson v. Dep't of State*,
 565 F.3d 857 (D.C. Cir. 2009) .............................................................. 6, 7, 17, 18

*Linder v. NSA*,
 94 F.3d 693 (D.C. Cir. 1996) ............................................................................... 17

*Mayer Brown LLP v. IRS*,
 562 F.3d 1190 (D.C. Cir. 2009) ........................................................................... 23

*Military Audit Project v. Casey*,
 656 F.2d 724 (D.C. Cir. 1981) ............................................................................... 5

*Minier v. CIA*,
 88 F.3d 796 (9th Cir. 1996) ................................................................................... 4

*Morley v. CIA*,
 508 F.3d 1108 (D.C. Cir. 2007) ........................................................................... 16

*Morley v. CIA*,
 699 F. Supp. 2d 244 (D.D.C. 2010) ....................................................................... 8

*N.Y. Times Co. v. Dep't of Def.*,
 499 F. Supp. 2d 501 (S.D.N.Y. 2007) .................................................................. 18

*Peter S. Herrick's Customs & Int'l Trade Newsletter v. U.S. Customs & Border Prot.*,
   Civil Action No. 04-00377 (JDB), 2006 WL 1826185 (D.D.C. 2006) .................................... 23

*Phillippi v. CIA*,
   546 F.2d 1009 (D.C. Cir. 1976) ................................................................................................ 7

*Pub. Citizen v. Dep't of State*,
   11 F.3d 198 (D.C. Cir. 1993) ................................................................................................... 27

*Pub. Emps. for Envtl. Responsibility v. U.S. Section, Int'l Boundary & Water Comm'n, U.S.-Mexico*,
   740 F.3d 195 (D.C. Cir. 2014) ................................................................................. 20, 22, 23

*Ray v. Turner*,
   587 F.2d 1187 (D.C. Cir. 1978) ................................................................................................ 6

*Robinson v. Deutsche Bank Nat. Tr. Co.*,
   932 F. Supp. 2d 95 (D.D.C. 2013) .......................................................................................... 27

*SafeCard Servs., Inc. v. SEC*,
   926 F.2d 1197 (D.C. Cir. 1991) ................................................................................................ 5

*Sea Shepherd Conservation Soc'y v. IRS*,
   208 F. Supp. 3d 58 (D.D.C. 2016) ............................................................................................ 7

*Sussman v. U.S. Marshals Serv.*,
   494 F.3d 1106 (D.C. Cir. 2007) .............................................................................................. 21

*Talbot v. CIA*,
   578 F. Supp. 2d 24 (D.D.C. 2008) .......................................................................................... 18

*Tax Analysts v. IRS*,
   294 F.3d 71 (D.C. Cir. 2002) ................................................................................................... 24

*Techserve All. v. Napolitano*,
   803 F. Supp. 2d 16 (D.D.C. 2011) .......................................................................................... 24

*Urban Air Initiative, Inc. v. EPA*,
   --- F. Supp. 3d ---- , 2017 WL 4284542 (D.D.C. Sept. 25, 2017) ........................................... 5

*Wheeler v. CIA*,
   271 F. Supp. 2d 132 (D.D.C. 2003) .......................................................................................... 8

*Winter v. NSA*,
   569 F. Supp. 545 (S.D. Cal. 1983) .......................................................................................... 18

*Wolf v. CIA*,
   473 F.3d 370 (D.C. Cir. 2007) ...................................................................................... *passim*

**STATUTES**

5 U.S.C. § 552(a)(4)(B) ................................................................................................. 4, 5

5 U.S.C. § 552(b) ............................................................................................................... 4

5 U.S.C. § 552(b)(1) .......................................................................................................... 8

5 U.S.C. § 552(b)(3) ........................................................................................................ 16

5 U.S.C. § 552(b)(7) ........................................................................................................ 20

5 U.S.C. § 552(b)(7)(A) ................................................................................................... 21

5 U.S.C. § 552(b)(7)(E) ................................................................................................... 22

18 U.S.C. § 798 ................................................................................................................ 18

18 U.S.C. § 798(a)(3) ....................................................................................................... 18

18 U.S.C. § 798(a)(4) ....................................................................................................... 18

18 U.S.C. § 798(b) ........................................................................................................... 18

50 U.S.C. § 3024 ................................................................................................... 17, 19, 20

50 U.S.C. § 3024(i)(1) ........................................................................................... 18, 19, 20

50 U.S.C. § 3605 .............................................................................................................. 17

50 U.S.C. § 3605(a) ......................................................................................................... 17

**REGULATIONS**

Exec. Order 13,526 § 1.4, 75 Fed. Reg. 707, 709 (Dec. 29, 2009) ....................................... *passim*

**OTHER AUTHORITIES**

Ali Vitali & Ken Dilanian, National Security Adviser McMaster: Trump's Revelations to
    Russians 'Wholly Appropriate,' NBC News (May 16, 2017),
    https://www.nbcnews.com/politics/white-house/national-security-adviser-mcmastertrump-s-
    revelations-russians-wholly-appropriate-n760136 ................................................................. 27

CSPAN, National Security Adviser on Oval Office Meeting with Russians (May 16, 2017),
    https://www.c-span.org/video/?428569-1/national-security-adviser-defends-presidents-
    disclosure-classified-information-russians ........................................................................... 27

H.R. Rep. No. 89-1497 (1966), *reprinted in* 1966 U.S.C.C.A.N. 2418 ......................................... 4

## INTRODUCTION

Pursuant to the Freedom of Information Act ("FOIA"), Plaintiffs The James Madison Project, et al. ("Plaintiffs") have sought a variety of records from five United States Government components related to a meeting between President Trump and Russian government officials in which he purportedly shared classified information. The FOIA requests focus on "intelligence information" that was actually part of the "discussion" at that meeting. As Plaintiffs have alleged, any such "intelligence information" is "sensitive classified information." The Central Intelligence Agency ("CIA"), National Security Agency ("NSA"), and Federal Bureau of Investigation ("FBI") (collectively, "Defendants") have not publicly acknowledged that they, individually or collectively, had any role in the meeting, including any briefing related to the same, or in the collection, analysis, or dissemination of any intelligence related to, informing, or discussed in that meeting. Conversely, they have also not denied any involvement.[1] Thus, Defendants can neither confirm nor deny the existence or nonexistence of records responsive to Plaintiffs' FOIA request—a so-called "Glomar response." Defendants' supporting declarations establish that providing an affirmative or negative response to Plaintiffs' request would reveal classified information protected by FOIA Exemption 1, as well as compromise intelligence sources and methods shielded from disclosure by FOIA Exemption 3. The FBI also explains that it cannot acknowledge whether it possesses responsive records without disclosing law enforcement sensitive information protected from disclosure by FOIA Exemption 7. The Court

---

[1] The parties agreed that they would first litigate the propriety of the Glomar response made by the CIA, NSA, and FBI. *See* Status Report, Dkt. No. 7. The other defendant agencies in this case, the Department of State and the Defense Intelligence Agency, provided substantive responses, which the parties agreed would not be addressed in this motion for partial summary judgment. *Id.* For purposes of this memorandum, therefore, "Defendants" only refers to the CIA, NSA, and FBI.

should defer to Defendants' determination in this regard and grant the Government summary judgment.

Plaintiffs contend that Defendants' Glomar response has been undermined by official, public disclosures made by President Trump and other senior administration officials.  None of the identified statements actually indicate one way or another whether Defendants possess any materials responsive to Plaintiffs' FOIA request—the operative question when considering the propriety of a Glomar response and official acknowledgements.  Indeed, none of the statements, even assuming they constitute official disclosures, remotely confirm that Defendants played any role in the May 10 meeting or any alleged briefing that occurred in connection with the meeting. As such, Defendants are entitled to summary judgment.

## BACKGROUND

This action arises from identical FOIA requests Plaintiffs submitted to the CIA, NSA, FBI, Department of State, and Defense Intelligence Agency.  *See* Compl. ¶¶ 17, 26, 31, 36, 42, Dkt. No. 1.  The requests sought three categories of records related to President Trump's purported sharing of classified information during a meeting with Russian government officials on May 10, 2017 ("May 10 meeting"). *Id.*  By letters dated May 22, 2017, Plaintiffs stated that they specifically sought:

·   Any documentation – including, but not limited to, transcripts or notes – memorializing the contents of the discussion between President Trump and the two Russian Government officials in the Oval Office on May 10, 2017;

·   Any documentation relied upon for the purpose of briefing President Trump on the intelligence information that falls within the scope of information referenced in category #1, including, but not limited to, documentation that identified the country that had originally gathered the information; and

·   Any documentation – including documentation reflecting verbal statements – memorializing the briefing in which President Trump was informed of the intelligence information that falls within the scope of information referenced in category #1,

including, but not limited to, documentation that identified the country that had originally
gathered the information.

*See* Compl. ¶ 17.  These letters specify that the "intelligence information at issue" was "sensitive

classified information . . . . concern[ing] details of a terrorist threat related to the use of laptop

computers on commercial aircraft," and the "original source" of this intelligence information was

Israel.  *See* Compl. ¶¶ 11, 13; *see also, e.g.*, Declaration of Antoinette B. Shiner ("Shiner Decl."),

Ex. A at 1–2.  None of the defendant agencies provided a substantive response by the time

Plaintiffs initiated this lawsuit with the filing of the Complaint on June 22, 2017.  *See* Answer

¶¶ 22, 27, 32, 38, 43, Dkt. No. 5.

In response to the Court's August 11, 2017 Order, Defendants filed a status report setting

forth a proposed course of action.  *See* Status Report, Dkt. No. 7.  The Government explained

that the CIA, NSA, and FBI could neither confirm nor deny whether they possess responsive

materials without revealing information that is exempt from disclosure by FOIA.  *Id.* at ¶ 2.

Defendants also stated that the Defense Intelligence Agency did not locate any responsive

records, and the Department of State required a modest amount of additional time to complete its

search for responsive materials.[2]  *Id.* at ¶¶ 2, 3.  The parties recommended that they should first

litigate the propriety of the Glomar responses, and later, if necessary, file motions for partial

summary judgment with regard to the substantive responses provided by the Defense Intelligence

Agency and the Department of State.  *Id.* at ¶ 4.  The parties proposed a briefing schedule, which

provided, somewhat unusually for a FOIA case, that Plaintiffs (at their request) would move for

partial summary judgment first, before Defendants filed their motion.  *Id.*

---

[2]  The Department of State provided its final response and disclosed responsive, non-exempt
documents on September 29, 2017.  *See* Status Report, Dkt. No. 7, ¶ 3.

The Court adopted the parties' suggested course of action.  *See* Sept. 8, 2017 Minute

Order.  Plaintiffs subsequently filed their motion for partial summary judgment on September 18,

2017.  *See* Pls.' Mot. for Partial Summ. J., Dkt. No. 8.  The instant motion followed.

## ARGUMENT

## I.      STATUTORY STANDARDS

### A.      The Freedom of Information Act

The "basic purpose" of FOIA reflects a "general philosophy of full agency disclosure

unless information is exempted under clearly delineated statutory language."  *John Doe Agency*

*v. John Doe Corp.*, 493 U.S. 146, 152 (1989).  "Congress recognized, however, that public

disclosure is not always in the public interest."  *CIA v. Sims*, 471 U.S. 159, 166–67 (1985).

Accordingly, in passing FOIA, "Congress sought 'to reach a workable balance between the right

of the public to know and the need of the Government to keep information in confidence to the

extent necessary without permitting indiscriminate secrecy.'"  *John Doe Agency*, 493 U.S. at 152

(quoting H.R. Rep. No. 89-1497, at 6 (1966), *reprinted in* 1966 U.S.C.C.A.N. 2418, 2423).  As

the D.C. Circuit has recognized, "FOIA represents a balance struck by Congress between the

public's right to know and the [G]overnment's legitimate interest in keeping certain information

confidential."  *Ctr. for Nat'l Sec. Studies v. Dep't of Justice*, 331 F.3d 918, 925 (D.C. Cir. 2003)

(citing *John Doe Agency*, 493 U.S. at 152).

FOIA mandates disclosure of government records unless the requested information falls

within one of nine enumerated exemptions.  *See* 5 U.S.C. § 552(b).  "A district court only has

jurisdiction to compel an agency to disclose improperly withheld agency records," *i.e.* records

that do "not fall within an exemption."  *Minier v. CIA*, 88 F.3d 796, 803 (9th Cir. 1996)

(emphasis omitted); *see also* 5 U.S.C. § 552(a)(4)(B) (providing the district court with

jurisdiction only "to enjoin the agency from withholding agency records and to order the

production of any agency records improperly withheld from the complainant"); *Kissinger v.*

*Reporters Comm. for Freedom of the Press*, 445 U.S. 136, 150 (1980) ("Under 5 U.S.C.

§ 552(a)(4)(B)[,] federal jurisdiction is dependent upon a showing that an agency has (1)

'improperly' (2) 'withheld' (3) 'agency records.'").  While narrowly construed, FOIA's statutory

exemptions "are intended to have meaningful reach and application."  *John Doe Agency*, 493

U.S. at 152; *accord DiBacco v. U.S. Army*, 795 F.3d 178, 183 (D.C. Cir. 2015).

The courts resolve most FOIA actions on summary judgment.  *See Urban Air Initiative,*

*Inc. v. EPA*, --- F. Supp. 3d ---- , 2017 WL 4284542, at *6 (D.D.C. Sept. 25, 2017).  The

Government bears the burden of proving that the withheld information falls within the

exemptions it invokes.  *See* 5 U.S.C. § 552(a)(4)(B); *King v. Dep't of Justice*, 830 F.2d 210, 217

(D.C. Cir. 1987).  A court may grant summary judgment to the Government based entirely on an

agency's declarations, provided they articulate "the justifications for nondisclosure with

reasonably specific detail, demonstrate that the information withheld logically falls within the

claimed exemption, and are not controverted by either contrary evidence in the record nor by

evidence of agency bad faith."  *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir.

1981); *accord Urban Air Initiative, Inc.*, 2017 WL 4284542, at *6.  Such declarations are

accorded "a presumption of good faith, which cannot be rebutted by purely speculative

claims[.]"  *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991).

### B.    Special Considerations in National Security Cases

The issues presented in this case directly "implicat[e] national security, a uniquely

executive purview."  *Ctr. for Nat'l Sec. Studies*, 331 F.3d at 926–27.  While courts review *de*

*novo* an agency's withholding of information pursuant to a FOIA request, "*de novo* review in

FOIA cases is not everywhere alike." *Ass'n of Retired R.R. Workers, Inc. v. U.S. R.R. Ret. Bd.*, 830 F.2d 331, 336 (D.C. Cir. 1987). Indeed, the courts have specifically recognized the "propriety of deference to the executive in the context of FOIA claims which implicate national security." *Ctr. for Nat'l Sec. Studies*, 331 F.3d at 927–28; *see Ray v. Turner*, 587 F.2d 1187, 1194 (D.C. Cir. 1978) ("[T]he executive ha[s] unique insights into what adverse [e]ffects might occur as a result of public disclosure of a particular classified record."). Thus, the agencies' "arguments need only be both 'plausible' and 'logical' to justify the invocation of a FOIA exemption in the national security context." *Benjamin v. U.S. Dep't of State*, 178 F. Supp. 3d 1, 4 (D.D.C. 2016) (quoting *ACLU v. Dep't of Def.*, 628 F.3d 612, 624 (D.C. Cir. 2011)), *aff'd by* No. 16-5175, 2017 WL 160801 (D.C. Cir. Jan. 3, 2017).

For these reasons, the courts have "consistently deferred to executive affidavits predicting harm to the national security, and have found it unwise to undertake searching judicial review." *Ctr. for Nat'l Sec. Studies*, 331 F.3d at 927; *see Larson v. Dep't of State*, 565 F.3d 857, 865 (D.C. Cir. 2009) ("Today we reaffirm our deferential posture in FOIA cases regarding the 'uniquely executive purview' of national security."); *accord Benjamin*, 178 F. Supp. 3d at 4. Consequently, a reviewing court must afford "substantial weight" to agency declarations "in the national security context." *King*, 830 F.2d at 217; *see Fitzgibbon v. CIA*, 911 F.2d 755, 766 (D.C. Cir. 1990) (holding that the district court erred in "perform[ing] its own calculus as to whether or not harm to the national security or to intelligence sources and methods would result from disclosure"); *Frugone v. CIA*, 169 F.3d 772, 775 (D.C. Cir. 1999) (because "courts have little expertise in either international diplomacy or counterintelligence operations, we are in no position to dismiss the CIA's facially reasonable concerns" about the harm that disclosure could cause to national security). FOIA "bars the courts from prying loose from the government even

the smallest bit of information that is properly classified or would disclose intelligence sources or

methods." *Afshar v. Dep't of State*, 702 F.2d 1125, 1130 (D.C. Cir. 1983).

## II.   DEFENDANTS PROPERLY DECLINED TO CONFIRM OR DENY THE EXISTENCE OR NONEXISTENCE OF RECORDS RESPONSIVE TO PLAINTIFFS' FOIA REQUESTS

A Glomar response allows the Government to "refuse to confirm or deny the existence of

records where to answer the FOIA inquiry would cause harm cognizable under an FOIA

exception." *Wolf v. CIA*, 473 F.3d 370, 374 (D.C. Cir. 2007) (quoting *Gardels v. CIA*, 689 F.2d

1100, 1103 (D.C. Cir. 1982)); *accord Sea Shepherd Conservation Soc'y v. IRS*, 208 F. Supp. 3d

58, 89 (D.D.C. 2016) ("The Glomar doctrine applies when confirming or denying the existence

of records would itself cause harm cognizable under a FOIA exception."). The Court should

afford "substantial weight" to the agencies' determinations to assert Glomar responses. *Sea*

*Shepherd Conservation Society*, 208 F. Supp. 3d at 89. And summary judgment is appropriate

when the asserting agencies put forth "public affidavit[s] explaining in as much detail as is

possible the basis for its claim that it can be required neither to confirm nor to deny the existence

of the requested records." *Phillippi v. CIA*, 546 F.2d 1009, 1013 (D.C. Cir. 1976). Ultimately,

the Government can establish the appropriateness of the Glomar response if it is deemed

"logical" or "plausible." *Wolf*, 473 F.3d at 375.

The courts in this Circuit have consistently upheld Glomar responses where, as here,

confirming or denying the existence of records would reveal classified information protected by

FOIA Exemption 1 or disclose information protected by statute in contravention of FOIA

Exemption 3. *See, e.g.*, *Frugone*, 169 F.3d at 774–75 (finding that CIA properly refused to

confirm or deny the existence of records concerning the plaintiff's alleged employment

relationship with CIA pursuant to Exemptions 1 and 3); *Larson*, 565 F.3d at 861–62 (upholding

the National Security Agency's use of the Glomar response to the plaintiffs' FOIA requests regarding past violence in Guatemala pursuant to Exemptions 1 and 3); *Wheeler v. CIA*, 271 F. Supp. 2d 132, 140 (D.D.C. 2003) (ruling that CIA properly invoked a Glomar response to a request for records concerning the plaintiff's activities as a journalist in Cuba during the 1960s pursuant to Exemption 1); *Morley v. CIA*, 699 F. Supp. 2d 244, 257–58 (D.D.C. 2010) (upholding CIA's Glomar response to the plaintiff's request concerning covert CIA operations pursuant to Exemptions 1 and 3).

Here, Defendants can neither confirm nor deny whether they possess records responsive to Plaintiffs' FOIA requests because the Government has determined that the existence or non-existence of any such records is exempt from disclosure. *See* Declaration of David M. Hardy ("Hardy Decl.") ¶ 12; Declaration of David J. Sherman ("Sherman Decl.") ¶ 19; Shiner Decl. ¶ 9.

## A. Defendants Correctly Invoked Their Glomar Responses under FOIA Exemption 1

FOIA Exemption 1 protects from disclosure information that is "specifically authorized under criteria established by an Executive order to be kept secret in the interest of national defense or foreign policy" and "are in fact properly classified pursuant to such Executive Order." 5 U.S.C. § 552(b)(1). Under Executive Order 13,526, an agency may withhold information that an official with original classification authority has determined to be classified because its "unauthorized disclosure could reasonably be expected to cause identifiable or describable damage to the national security[.]" Exec. Order 13,526 § 1.4, 75 Fed. Reg. 707, 709 (Dec. 29, 2009). The information must also "pertain[] to" one of the categories of information specified in the Executive Order, including "intelligence activities (including covert action), intelligence

sources or methods."[3]  Exec. Order 13,526 §§ 1.4(c); *see also Judicial Watch, Inc. v. Dep't of Defense*, 715 F.3d 937, 941 (D.C. Cir. 2013) ("[P]ertains is not a very demanding verb.").  As addressed above, when it comes to matters affecting national security, the courts afford "substantial weight" to an agency's declarations addressing classified information, *King*, 830 F.2d at 217, and defer to the expertise of agencies involved in national security and foreign relations.  *See Fitzgibbon*, 911 F.2d at 766; *see also Benjamin*, 178 F. Supp. 3d at 4.  Given that Plaintiffs' FOIA requests, on their face, seek "intelligence information" and the "identif[ication]" of the source of that information, it is not difficult to demonstrate that the existence or nonexistence of records would relate to intelligence activities, sources, or methods and would therefore be classified.  Defendants more than accomplish this task.

### 1.   The NSA's Glomar response protects classified information.

The NSA invoked its Glomar response to shield from disclosure properly classified information.  *See* Sherman Decl. ¶ 4.  The NSA's mission "includes the responsibility to collect, process, analyze, produce, and disseminate signals intelligence ("SIGINT") information, for foreign intelligence and counterintelligence purposes to support national and department missions to include the conduct of military operations."  *Id.* at ¶ 5.  The NSA gathers and analyzes such intelligence information to counter threats to the United States and our allies, as well as provide direction to those responsible for our country's foreign policy.  *Id.* at ¶ 7.  The information collected by the NSA is relevant to numerous matters such as "military order of battle, threat warnings and readiness, arms proliferation, terrorism, and foreign aspects of international narcotics and trafficking."  *Id.*  In this case, to confirm one way or another whether

---

[3]  As also required by Executive Order 13,526, Section 1.1(a), the declarants have confirmed that they are original classification authorities.  *See* Hardy Decl. ¶ 2; Sherman Decl. ¶ 2; Shiner Decl. ¶ 3.

the NSA possesses records responsive to Plaintiffs' FOIA request regarding "intelligence information" would disclose whether or not NSA's SIGINT information and its collection was involved in the May 10 meeting or any alleged briefing that occurred in connection with that meeting. *Id.* at ¶ 18.

The NSA invoked its Glomar response in order to safeguard classified information involving Section 1.4(c) of Executive Order 13,526. *See* Sherman Decl. ¶ 22. The existence or non-existence of responsive records with respect to the NSA plainly implicates "intelligence activities (including covert action), intelligence sources or methods, or cryptology." Exec. Order 13,526 §1.4(c). The NSA collects a specific form of intelligence—SIGINT—and thus, by the very nature of its mission, confirming or denying possession of responsive documents pertains to intelligence activities, sources, and methods. *See* Sherman Decl. ¶ 5.

The Sherman Declaration demonstrates that confirming whether or not the NSA possesses records responsive to the first part of Plaintiffs' request reasonably could be expected to cause "grave damage" to the national security of the United States. *See* Sherman Decl. ¶¶ 23–28. In particular, Plaintiffs request all materials memorializing the "contents" of the May 10 meeting between President Trump and Russian government officials. *Id.* at ¶ 25. Admitting one way or another whether NSA possesses responsive records "would reveal critical information concerning the focus and direction of the NSA's intelligence mission." *Id.* at ¶ 24. Indeed, verification that the NSA has responsive materials would tend to confirm that the NSA participated in the meeting or that SIGINT collection contributed to the preparation for, or topics discussed at, the meeting. *Id.* at ¶¶ 24, 25. In contrast, a denial that the NSA possesses responsive records would demonstrate that it did not have an intelligence interest in the meeting or the subject matter discussed. *Id.* Either outcome would reveal classified information about

the "specific targets, direction, and emphases of NSA's intelligence work," the disclosure of which would undermine the NSA's mission and harm national security. *Id.* at ¶ 25. Relatedly, senior government officials have confirmed that the May 10 meeting involved a discussion about airline safety. *Id.* Disclosing one way or another whether the NSA had an interest in this specific topic "would provide critical information to our adversaries concerning NSA's focus, as well as its current capabilities and understanding of specific threats." *Id.*

Likewise, the second and third parts of Plaintiffs' request present similar problems. *See* Sherman Decl. ¶ 26. Plaintiffs specifically seek records memorializing or relied upon during the briefing President Trump purportedly received prior to the May 10 meeting. *Id.* But affirmatively stating whether the NSA possesses briefing materials would confirm one way or another if it collects SIGINT about the topic(s) discussed during the meeting or the Russian officials who attended. *Id.* By confirming or denying possession of records, our adversaries would gain valuable information about the type of intelligence collected by the NSA, which would cause harm to this country's national security. *Id.* Similarly, Plaintiffs request documentation about the identity of the "country that had originally gathered" the shared information, which was allegedly discussed during the briefing. *Id.* As the Sherman Declaration makes clear, the NSA "cannot confirm or deny the possession of intelligence information originating from a specific source without gravely compromising its core activities and overarching mission." *Id.* The NSA, therefore, has established the propriety of the Glomar response. *See, e.g.*, *Frugone*, 169 F.3d at 775 ("Mindful that courts have little expertise in either international diplomacy or counterintelligence operations, we are in no position to dismiss [the agency's] facially reasonable concerns.").

11

### 2.     The CIA's Glomar response protects classified information.

The CIA also properly asserted its Glomar response to protect currently and properly classified information.  *See* Shiner Decl. ¶¶ 9–14.  As an intelligence agency that "by its very nature must operate clandestinely," the CIA does not ordinarily reveal whether or not it had any part or interest in a meeting between U.S. government officials and representatives of a foreign government or the subject matter of the conversations.  *Id.* at ¶ 9.  Here, the CIA can neither confirm nor deny whether it played any role in the meeting between President Trump and Russian government officials that occurred on May 10, 2017, or the briefing concerning that meeting.  *Id.*  More specifically, the CIA cannot say one way or another whether it "had any involvement in alleged discussions about intelligence information . . . about an alleged terrorist threat related to the use of laptop computers on commercial flights."  *Id.*  Indeed, confirmation that the CIA possesses responsive records would indicate that the CIA had a role or an interest in the May 10, 2017 meeting and its subject matter or, at minimum, the purported briefing that led up to the meeting.  *Id.* at ¶ 14.  Conversely, affirming that the CIA did not have responsive materials would suggest that it did not participate in the meeting or have an interest in the topics discussed.  *Id.*  As discussed in greater depth below, either scenario would reveal classified information that the Glomar response is intended to protect from disclosure.

The CIA also invoked its Glomar response to protect properly classified information under Section 1.4(c).  By confirming whether or not it possesses responsive records, the CIA would appear to be acknowledging one way or another whether it played a role in the May 10, 2017 meeting or the earlier briefing, which, in and of itself, constitutes an intelligence activity.  *See* Shiner Decl. ¶ 22.  Moreover, acknowledging whether the CIA has responsive records pertains to intelligence source or methods because it would appear to indicate whether the CIA

used the diplomatic meeting for intelligence purposes.  *Id.* at ¶ 24.  And relatedly, confirming or denying the existence of responsive materials pertains to the CIA's purported receipt of intelligence information from a specific intelligence source—the Israeli government.  *Id.*; *see* Compl. ¶ 13.

The Shiner Declaration establishes that confirming whether or not the CIA possesses responsive records reasonably could be expected to cause damage to the national security of the United States by disclosing intelligence activities.  *See* Shiner Decl. ¶¶ 21–23.  The CIA does not ordinarily reveal when it does and does not participate in or assist with a particular White House meeting with representatives of a foreign government.  *Id.* at ¶¶ 22–23.  "It would be alerting and possibly alarming for foreign countries" to learn that the CIA partook in a specific diplomatic meeting, as it would signal to countries around the world that the meeting or subject matter warranted CIA involvement.  *Id.* at ¶ 22.  In this specific case, confirming that the CIA possesses records would suggest or reveal, among other things, that the CIA attended the meeting, used the meeting to obtain intelligence from or about the Russian officials, or at least had an intelligence interest in the subject matter.  *Id.*  Alternatively, a denial that it had responsive records would tend to show that the CIA was not involved or did not have an interest in the topics discussed. *Id.*  In sum, disclosure of CIA activities in this regard would undermine the CIA's ability to effectively operate as a clandestine intelligence agency.  *Id.*

Further, the CIA's Glomar response is necessary to protect CIA sources and methods, the disclosure of which would cause damage to this country's national security.  *See* Shiner Decl. ¶ 24.  The CIA collects information from around the globe to be used by the President and his closest advisors when making national security decisions of great significance.  *Id.*  Often times, the CIA depends on information provided by foreign officials, nationals, and intelligence

services "under an arrangement of absolute secrecy." *Id.* By revealing how or from whom the

CIA does or does not collect such information, this country's adversaries will obtain "insight into

the methods the CIA uses to accomplish its intelligence mission." *Id.* As previously mentioned,

confirming or denying whether the CIA possesses responsive records would reveal whether the

CIA used the May 10, 2017 diplomatic meeting for intelligence purposes. *Id.* Moreover,

Plaintiffs seek records about an alleged briefing in which the President purportedly learned about

intelligence received from Israeli sources. *Id.*; *see* Compl. ¶ 13. Acknowledging one way or

another whether the CIA had responsive records, therefore, would "indicate whether or not the

CIA received and shared intelligence from Israeli sources." Shiner Decl. ¶ 24. Accordingly,

confirming or denying whether the CIA possesses responsive records would reveal the sort of

information that foreign intelligence services and terrorist organizations seek to obtain "to defeat,

undermine, and avoid CIA activities and to attack the United States and its interests." *Id.* at ¶ 21.

### 3. The FBI's Glomar response protects classified information.

In addition, the FBI properly asserted its Glomar response to protect currently and

properly classified information. *See* Hardy Decl. ¶¶ 17–29. The FBI functions as a national

security agency "with dual intelligence and law enforcement missions." *Id.* at ¶ 10. As such, the

FBI will assert a Glomar response in order to protect currently and properly classified

information, among other reasons. *Id.* In this case, acknowledging whether or not the FBI

possesses responsive documents would tend to indicate one way or another whether the agency

collected, analyzed, or disseminated intelligence regarding the terror plot described in Plaintiffs'

FOIA request. *Id.* at ¶ 12. A substantive response would also tend to confirm or deny the FBI's

interest in the May 10 meeting, "as well as intelligence sources and methods related to the

collection of intelligence from diplomatic meetings generally." *Id.* Such revelations would disclose classified information thereby necessitating the FBI's Glomar response. *Id.* at ¶ 12, 14.

The FBI also invoked Section 1.4(c). The Hardy Declaration explains that an intelligence activity, source or method, encompasses any intelligence action "utilized by the FBI against a targeted individual or organization that has been determined to be of national security interest." Hardy Decl. ¶ 22. The FBI's Glomar response in this case seeks to protect information pertaining to intelligence activities, sources, and methods in the context of the alleged terrorist plot, its discussion at the May 10 meeting, and purported briefing in connection with that meeting. *Id.* at ¶ 25.

The Hardy Declaration establishes that confirming whether or not the FBI possesses responsive records reasonably could be expected to cause damage to the national security of the United States. *See* Hardy Decl. ¶¶ 22–29. By acknowledging one way or another whether the FBI possesses responsive documents, the agency would confirm whether or not it had an intelligence interest in the May 10 meeting, as well as an interest in the specific terrorist plot reportedly discussed during the briefing and meeting. *Id.* at ¶ 26. This includes confirmation or denial of whether the FBI collected, analyzed, or disseminated intelligence on the topic of the alleged plot. *Id.* Revealing this information would allow our adversaries, including foreign intelligence entities and terrorist organization, "to learn about the functions, interests, methods, and capabilities of the FBI and its intelligence gathering activities." *Id.* at ¶ 27. Indeed, acknowledging that the FBI collected intelligence on a plot planned by a specific entity would alert the organization that the agency had information about its activities, which could undermine the FBI's ability to prevent terrorist attacks. *Id.* Such information would also be shared with other like-minded foes, revealing the FBI's interests, activities, and capabilities that could be

used to maximize the effectiveness of similar plots.  *Id.*  If the FBI acknowledges that it does not

have responsive materials, on the other hand, our adversaries would learn that the FBI did not

have an interest or capability to learn about a particular terrorist scheme.  *Id.*  In either case,

damage would be caused to this country's national security by "thwarting the effectiveness of the

FBI's covert efforts to detect, identify, and disrupt . . . plans to attack the United States and its

interests."  *Id.*

      **B.**      **Defendants Properly Invoked Their Glomar Responses under FOIA
Exemption 3**

      FOIA Exemption 3 exempts from disclosure records that are "specifically exempted from

disclosure by [another] statute" if the relevant statute "requires that the matters be withheld from

the public in such a manner as to leave no discretion on the issue" or "establishes particular

criteria for withholding or refers to particular types of matters to be withheld."  5 U.S.C.

§ 552(b)(3).  The Government's mandate to withhold information under FOIA Exemption 3 is

broader than its authority under FOIA Exemption 1, as it need not demonstrate that the

disclosure will harm national security.  *See Sims*, 471 U.S. at 167; *Gardels*, 689 F.2d at 1106–07.

Instead, "the sole issue for decision is the existence of a relevant statute and the inclusion of

withheld material within the statute's coverage.  It is particularly important to protect intelligence

sources and methods from public disclosure."  *Morley v. CIA*, 508 F.3d 1108, 1126 (D.C. Cir.

2007).  In analyzing the propriety of a withholding made pursuant to FOIA Exemption 3, the

Court need not examine "the detailed factual contents of specific documents[.]"  *Id.*  For the

reasons discussed below, Defendants properly asserted their respective Glomar responses

pursuant to FOIA Exemption 3.

1.      **The NSA's Glomar response shields statutorily-protected information.**

The Sherman Declaration attests that the NSA has properly invoked the Glomar response to shield from disclosure statutorily-protected information pursuant to FOIA Exemption 3. *See* Sherman Decl. ¶¶ 29–35. In particular, the following statutes prohibit the NSA from providing Plaintiffs with a substantive response: (i) Section 6 of the National Security Agency Act of 1959, 50 U.S.C. § 3605; (ii) 18 U.S.C. § 798; and (iii) Section 102(A)(i)(1) of the National Security Act of 1947, as amended, 50 U.S.C. § 3024.

The first applicable statute is Section 6 of the National Security Agency Act of 1959, codified at 50 U.S.C. § 3605. *See* Sherman Decl. ¶ 32. This provision states that "nothing in this [Act] or any other law . . . shall be construed to require the disclosure of the organization or any function of the National Security Agency, or any information with respect to the activities thereof [.]" 50 U.S.C. § 3605(a). The D.C. Circuit has held that this provision "qualifies as an Exemption 3 statute" and "provides absolute protection." *Larson*, 565 F.3d at 868 (citing *Linder v. NSA*, 94 F.3d 693, 698 (D.C. Cir. 1996)); *accord Hamdan v. Dep't of Justice*, 797 F.3d 759, 776 (9th Cir. 2015) ("[T]he plain language of a statute stating that no law shall require disclosure of certain records indisputably satisfies the criteria of Exemption 3."). Indeed, the provision states unequivocally that, notwithstanding any other law, including FOIA, the NSA cannot be compelled to disclose any information with respect to its activities. *See* 50 U.S.C. § 3605. The Sherman Declaration confirms that acknowledging one way or another whether the NSA possesses responsive records would reveal information about its core functions and activities, which remains protected pursuant to 50 U.S.C. § 3605 and FOIA Exemption 3. *See* Sherman Decl. ¶ 32.

17

Further, 18 U.S.C. § 798 similarly disallows the NSA from acknowledging its possession

of responsive record (or lack thereof).  *See* Sherman Decl. ¶ 33.  This provision in the federal

criminal code prohibits the unauthorized disclosure of classified information "concerning the

communication intelligence activities of the United States" or "obtained by the process of

communication intelligence from the communications of any foreign government."  18 U.S.C.

§ 798(a)(3)–(4).  The statute goes on to define "communication intelligence" as "all procedures

and methods used in the interception of communications and the obtaining of information from

such communications by other than the intended recipients[.]"  18 U.S.C. § 798(b).  The courts

have generally recognized that this provision qualifies as a statute that falls within the ambit of

FOIA Exemption 3.  *See Larson*, 565 F.3d at 868 (citing *N.Y. Times Co. v. Dep't of Def.*, 499 F.

Supp. 2d 501, 512–13 (S.D.N.Y. 2007); *Winter v. NSA*, 569 F. Supp. 545, 548 (S.D. Cal. 1983)).

Without confirming or denying whether the NSA possesses responsive documents, the Sherman

Declaration explains that to the extent that the very nature of the request implicates

"communication intelligence activities," this statutory scheme exempts the NSA from disclosing

whether it does or does not possess responsive records.  *See* Sherman Decl. ¶ 33.

Finally, Section 102A(i)(1) of the National Security Act of 1947, as amended (now

codified at 50 U.S.C. § 3024(i)(1)), requires the Director of National Intelligence to "protect

intelligence sources and methods from unauthorized disclosure."[4]  It is well-established that

Section 102A qualifies as a withholding statute for the purposes of FOIA Exemption 3.  *See, e.g.*,

*ACLU*, 628 F.3d at 619.  In fact, the Supreme Court has recognized the "wide-ranging authority"

---

[4]  The courts have recognized that not just the Director of National Intelligence, but also other agencies may rely upon the amended National Security Act to withhold records under FOIA. *See, e.g.*, *Larson*, 565 F.3d at 862–63, 865; *Talbot v. CIA*, 578 F. Supp. 2d 24, 28–29 n.3 (D.D.C. 2008).

provided by this provision to protect intelligence sources and methods. *Sims*, 471 U.S. at 159,

169–70, 177, 180; *see Halperin v. CIA*, 629 F.2d 144, 147 (D.C. Cir. 1980) (explaining that the

only question for the court is whether the agency has shown that responding to a FOIA request

"can reasonably be expected to lead to unauthorized disclosure of intelligence sources and

methods"). For the reasons discussed above with regard to Exemption 1, confirming or denying

whether the NSA possesses responsive records could divulge information about the existence or

non-existence of intelligence sources and methods protected from disclosure under this statute.

*See* Sherman Decl. ¶¶ 10–28, 34. The NSA, therefore, has demonstrated the appropriateness of

its Glomar response under FOIA Exemption 3.

### 2.      The CIA's Glomar response shields statutorily-protected information.

The Shiner Declaration attests that the CIA has properly invoked the Glomar response to

protect from disclosure statutorily-protected information pursuant to FOIA Exemption 3 and

Section 102A(i)(1) of the National Security Act of 1947, as amended, 50 U.S.C. § 3024. *See*

Shiner Decl. ¶¶ 26–28. Again, this statute requires the Government to "protect intelligence

sources and methods from unauthorized disclosure," 50 U.S.C. § 3024(i)(1), and it undoubtedly

qualifies as a withholding statute for the purposes of FOIA Exemption 3. *See, e.g.*, *ACLU*, 628

F.3d at 619. For the reasons discussed above with regard to FOIA Exemption 1, confirming or

denying whether the CIA possesses responsive records would divulge information about the

existence or non-existence of intelligence sources and methods protected from disclosure under

FOIA Exemption 3. *See* Shiner Decl. ¶¶ 27–28. Indeed, the Shiner Declaration explains that to

acknowledge the possession (or lack of possession) of materials responsive to Plaintiffs' request

would reveal whether or not the CIA used the May 10, 2017 meeting for intelligence purposes.

*Id.* at ¶¶ 24, 27–28. Further, a substantive response would tend to indicate one way or another

whether the CIA received and shared intelligence from Israeli sources, as alleged in some media reports.  *Id.* ¶ 24; *see* Compl. ¶ 13.  Accordingly, the CIA has demonstrated the appropriateness of its Glomar response under FOIA Exemption 3.

### 3.   The FBI's Glomar response shields statutorily-protected information.

The Hardy Declaration explains that the FBI has properly invoked its Glomar response to protect statutorily-protected information pursuant to FOIA Exemption 3 and Section 102A(i)(1) of the National Security Act of 1947, as amended, 50 U.S.C. § 3024.  *See* Hardy Decl. ¶¶ 30–32. As explained more fully above, this provision requires the Government to "protect intelligence sources and methods from unauthorized disclosure."  50 U.S.C. § 3024(i)(1); *see ACLU*, 628 F.3d at 619 (confirming that Section 102A(i)(1) qualifies as a withholding statute under FOIA Exemption 3).  For the reasons discussed above with regard to FOIA Exemption 1, confirming or denying whether the FBI possesses responsive records would reveal information about the existence or non-existence of intelligence sources and methods protected from disclosure under FOIA Exemption 3.  *See* Hardy Decl. ¶ 32.  Accordingly, the FBI has demonstrated that FOIA Exemption 3 provides an additional and independent basis for its Glomar response.

### C.   The FBI Correctly Invoked Its Glomar Response under FOIA Exemption 7

FOIA Exemption 7 protects from disclosure all "records or information compiled for law enforcement purposes" that could reasonably be expected to cause one of the six harms outlined in the Exemption's subparts.  5 U.S.C. § 552(b)(7).  "To fall within any of the exemptions under the umbrella of Exemption 7, a record must have been 'compiled for law enforcement purposes.'"  *Pub. Emps. for Envtl. Responsibility v. U.S. Section, Int'l Boundary & Water Comm'n, U.S.-Mexico*, 740 F.3d 195, 202 (D.C. Cir. 2014) (hereinafter "*PEER*") (quoting 5 U.S.C. § 552(b)(7)).  "According to the Supreme Court, the term 'compiled' in Exemption 7

requires that a document be created, gathered, or used by an agency for law enforcement

purposes at some time before the agency invokes the exemption." *Id.* at 203. In this case, the

Hardy Declaration explains that the FBI acts as the "primary investigative agency of the federal

government with authority and responsibility to investigate all violations of federal law,"

including investigations into acts of terrorism. Hardy Decl. ¶ 34. And the FBI confirms that

investigative records, if they exist, would relate to the FBI's law enforcement mission to

investigate, *inter alia*, possible national security threats. *Id.* at ¶ 35. Thus, any possible

responsive records would have been "compiled for law enforcement purposes," and as discussed

more fully below, the FBI cannot provide a substantive response without disclosing information

protected by FOIA Exemption 7.

### 1.     The FBI's Glomar response protects law enforcement sensitive information under FOIA Exemption 7(A).

Exemption 7(A) applies to "records or information compiled for law enforcement

purposes . . . to the extent that the production of such law enforcement records or information . . .

could reasonably be expected to interfere with enforcement proceedings." 5 U.S.C.

§ 552(b)(7)(A); *see Sussman v. U.S. Marshals Serv.*, 494 F.3d 1106, 1113–14 (D.C. Cir. 2007).

To satisfy its burden, an agency need only demonstrate that (1) a law enforcement proceeding is

pending or reasonably anticipate, and (2) release of the information—or confirming the mere

existence of responsive records—could reasonably be expected to interfere with enforcement

proceedings. *See Citizens for Responsibility & Ethics in Wash. v. U.S. Dep't of Justice*, 746 F.3d

1082, 1096 (D.C. Cir. 2014) (hereinafter "*CREW*").

In this case, providing a substantive response could reveal whether there is a pending or

reasonably anticipated enforcement proceeding. *See CREW*, 746 F.3d at 1096. The Hardy

declaration attests that "given the timing of the President's purported comments about the

alleged terror plot," any responsive documents would likely be a part of a pending national

security investigation that has not been recognized by the U.S. Government.  *See* Hardy Decl.

¶ 38.  Therefore, admitting whether or not responsive documents existed would tend to confirm

the existence or non-existence of a non-public national security investigation.  *Id.*

Assuming, without confirming, that such an investigation is underway, a concession that

the FBI possesses responsive materials would prematurely confirm its existence and interfere

with its progress.  *See CREW*, 746 F.3d at 1096.  By informing the targets of the FBI about an

ongoing investigation, the persons or organizations would be able to take defensive measures to

conceal their activities and elude detection.  *See* Hardy Decl. ¶ 39.  As a natural result, the

investigation would be severely hampered, and the FBI may be limited in its ability to thwart a

terrorist plot and potentially prosecute the matter if warranted.  *Id.*  Even if the FBI did not have

a pending investigation, the agency cannot provide a substantive response because to do so

would indicate that a Glomar response is only asserted when responsive records are possessed,

"thus rendering it ineffective."  *Id.*  As such, the FBI properly asserted its Glomar response in

accordance with FOIA Exemption 7(A).

> **2.      The FBI's Glomar response protects law enforcement sensitive
>          information under FOIA Exemption 7(E).**

To withhold information pursuant to Exemption (7)(E), the agency must demonstrate that

release of the information "would disclose techniques and procedures for law enforcement

investigations or prosecutions," or would "disclose guidelines for law enforcement investigations

or prosecutions if such disclosure could reasonably be expected to risk circumvention of the

law."  5 U.S.C. § 552(b)(7)(E).  The courts do not agree about whether the phrase "if such

disclosure could reasonably be expected to risk circumvention of the law" applies only to

"guidelines" or also applies to "techniques and procedures."  *See PEER*, 740 F.3d at 204.  But

members of this Court have afforded "techniques and procedures" categorical protection—i.e.,

not requiring a showing that "disclosure could reasonably be expected to risk circumvention of

the law." *See Durrani v. U.S. Dep't of Justice*, 607 F. Supp. 2d 77, 91 (D.D.C. 2009)

(acknowledging that techniques and procedures entitled to categorical protection under (7)(E));

*Peter S. Herrick's Customs & Int'l Trade Newsletter v. U.S. Customs & Border Prot.*, Civil

Action No. 04-00377 (JDB), 2006 WL 1826185, at *7 (D.D.C. 2006) (same); *see also Allard K.*

*Lowen Fischer Int'l Human Rights Project v. DHS*, 626 F.3d 678, 681 (2d Cir. 2010) (holding

that the "sentence structure of Exemption (b)(7)(E)" and "basic rules of grammar and

punctuation dictate that the qualifying phrase modifies only the . . . 'guidelines' clause" and that

"[a]ny potential ambiguity in the statute's plain meaning is removed . . . by the history of the

statute's amendments").

      Even if the Court required a showing that "disclosure could reasonably be expected to risk

circumvention of the law" to protect "techniques and procedures" from disclosure, the "risk

circumvention of the law" requirement presents a "low bar." *PEER*, 740 F.3d at 204 n.4 (noting that

"it is not clear" that the issue of whether an agency needs to show that disclosure of a technique or

procedure could reasonably be expected to risk circumvention of the law "matters much in practice"

given the "low bar" for the circumvention requirement). "[T]he text of exemption 7(E) is much

broader" than other exemptions that "set a high standard." *Mayer Brown LLP v. IRS*, 562 F.3d 1190,

1194 (D.C. Cir. 2009). "Rather than requiring a highly specific burden of showing how the law will

be circumvented, exemption 7(E) only requires that the [agency] 'demonstrate[] logically how the

release of [the requested] information might create a risk of circumvention of the law.'" *Id.*

(alterations in original) (citation omitted). Therefore, Exemption 7(E) "exempts from disclosure

information that could *increase the risks* that a law will be violated or that past violators will escape

legal consequences." *Id.* at 1193 (emphasis in original).

23

Exemption 7(E) generally protects those law-enforcement techniques and procedures that are "not well known to the public." *See Judicial Watch, Inc. v. U.S. Dep't of Commerce*, 337 F. Supp. 2d 146, 179 (D.D.C. 2004); *see also Albuquerque Publ'g Co. v. U.S. Dep't of Justice*, 726 F. Supp. 851, 857 (D.D.C. 1989) (Exemption 7(E) applies to "techniques and procedures generally unknown to the public"). But Exemption 7(E) also permits an agency to withhold information regarding non-public details about commonly-known procedures if the disclosure of such details could reduce or nullify their effectiveness. *See, e.g.*, *Barnard v. DHS*, 598 F. Supp. 2d 1, 23 (D.D.C. 2009) (recognizing that "[t]here is no principle . . . that requires an agency to release all details concerning these and similar techniques simply because some aspects of them are known to the public").

The FBI properly asserted its Glomar response pursuant to FOIA Exemption 7(E). *See* Hardy Decl. ¶¶ 41–45. Whether a potential threat satisfies the FBI's criteria to initiate a formal investigation qualifies as a law enforcement technique or procedure for purposes of FOIA Exemption 7(E). *Id.* at ¶ 43; *see Tax Analysts v. IRS*, 294 F.3d 71, 79 (D.C. Cir. 2002) (holding that "an agency may seek to block the disclosure of internal agency materials relating to guidelines, techniques, sources, and procedures for law enforcement investigations and prosecutions" under Exemption 7(E)); *Techserve All. v. Napolitano*, 803 F. Supp. 2d 16, 29 (D.D.C. 2011) (applying Exemption 7(E) to selection criteria for fraud investigations during H-1B visa process). Further, how the FBI commits resources to a particular threat, or a decision not to do so, is treated as a law enforcement technique or procedure. *See* Hardy Decl. ¶ 43. Here, acknowledging the existence or non-existence of responsive documents would, in essence, confirm one way or another whether the FBI has opened a national security investigation and devoted resources to the inquiry. *Id.* at ¶ 44. By making such a confirmation, our adversaries

would learn what sort of threats the FBI deems worthy of committing or not committing its

resources.  *Id.*  Equipped with this information, criminal or terrorist elements could alter their

behavior to avoid detection by the FBI, "making it more difficult for the FBI to be proactive in

assessing threats and investigating crimes."  *Id.*  Thus, the FBI properly invoked FOIA

Exemption 7(E).

## III. THE GOVERNMENT HAS NOT OFFICIALLY ACKNOWLEDGED THE CLASSIFIED, STATUTORILY PROTECTED, AND LAW ENFORCEMENT SENSITIVE INFORMATION PROTECTED BY THE GLOMAR RESPONSES

An agency may be compelled to provide information over a valid FOIA exemption claim

only when the specific information at issue has already been fully, publicly, and officially

disclosed.  *See ACLU v. CIA*, 710 F.3d 422, 426–27 (D.C. Cir. 2014) (quoting *Wolf*, 473 F.3d at

378).  FOIA plaintiffs "bear the initial burden of pointing to specific information in the public

domain that appears to duplicate that being withheld."  *Wolf*, 473 F.3d at 378 (quoting *Afshar*,

702 F.2d at 1130).  Plaintiffs must show (1) that the requested information is "as specific as the

information previously released;" (2) that the requested information "match the information

previously disclosed;" and (3) that the information has "already . . . been made public through an

official and documented disclosure."  *Id.*  In the Glomar response context, these requirements are

satisfied if the prior disclosures establish that the Government has already confirmed the

existence (or non-existence) of records responsive to the FOIA request.  *See ACLU*, 710 F.3d at

427.

Plaintiffs' lone argument amounts to their assertion that public comments, made by

President Trump and his senior advisors, undermine Defendants' respective Glomar responses.

*See* Pls.' Mem. at 7–12, Dkt. No. 8-1.  In particular, Plaintiffs allege that the prior comments

have publicly disclosed the following facts:

25

- The May 10, 2017 meeting itself took place in the Oval Office with the two senior Russian Government officials;

- President Trump disclosed information that he had the authority to provide;

- The information included "facts pertaining to terrorism and airline safety";

- The information included the identity of the city from which the evidence emanated;

- President Trump did not identify Israel as the country from which the information had been received; and

- In the aftermath of the meeting, a senior White House official reached out to CIA and NSA regarding the information President Trump had disclosed.

*See* Pls.' Mem. at 7–8, 10–11.

A cursory review of the publicly disclosed information, as described by Plaintiffs, reveals that there has not been confirmation one way or another whether the defendant agencies had any involvement with this particular meeting or possess responsive records.  *See ACLU*, 710 F.3d at 427.  Even assuming, arguendo, that these disclosures are publicly available and came from official sources, at most they confirm that a meeting took place with Russian officials in which President Trump shared certain information, the general subject matter of the information, and that the shared information allegedly included the name of the originating city.  None of the disclosures confirm in any detail the intelligence that the President shared or, more importantly, whether any specific government agencies participated in the meeting or preparatory briefing beforehand.  Nor do the disclosures reveal the identity of the government entity or entities, if any, that collected, analyzed, or disseminated the underlying intelligence.  Similarly, none of the disclosures remotely address the alleged briefing, the contents of the briefing, or who participated in the briefing.  In the end, Plaintiffs have failed to establish that these alleged disclosures confirm, one way or another, whether Defendants possess responsive records.  *See Wolf*, 473 F.3d at 378 ("The insistence on exactitude recognizes 'the Government's vital interest

26

in information relating to national security and foreign affairs.'" (quoting *Pub. Citizen v. Dep't of State*, 11 F.3d 198, 203 (D.C. Cir. 1993)).

The Court could appropriately discount reliance on the sixth piece of information that was allegedly disclosed to the public.  *See* Pls.' Mem. at 8, 11.  Citing a media report, Plaintiffs purport that "in the aftermath of the meeting," a White House official "reached out to CIA and NSA regarding the information President Trump had disclosed."[5]  *Id.*  It must first be noted that Plaintiffs made no mention of this media report in the Complaint.  *Compare* Compl. ¶¶ 10–13, *with* Pls.' Mem. at 7–8, 11; *see also Robinson v. Deutsche Bank Nat. Tr. Co.*, 932 F. Supp. 2d 95, 105 (D.D.C. 2013) (holding that a complaint cannot be amended by an opposition to a dispositive motion).  Further, while the cited media report suggests that National Security Adviser McMaster acknowledged this information, the unconfirmed statement was less clear and originated from a journalist's question during a press conference.  Specifically, the journalist asked National Security Adviser McMaster: "If there was nothing that the President shared that he shouldn't have shared, why did the counterterrorism adviser contact the NSA and CIA about what he said?"[6]  *See* CSPAN, National Security Adviser on Oval Office Meeting with Russians (May 16, 2017), https://www.c-span.org/video/?428569-1/national-security-adviser-defends-presidents-disclosure-classified-information-russians.  National Security Adviser McMaster responded: "I would say maybe from an overabundance of caution, but I'm not sure.  I have not

---

[5]  "Following Trump's conversations with the Russians, Homeland Security Adviser Tom Bossert reached out to the CIA and the National Security Agency likely out of 'an overabundance of caution,' McMaster said.  He added he has not spoken with Bossert about why he reached out."  Ali Vitali & Ken Dilanian, National Security Adviser McMaster: Trump's Revelations to Russians 'Wholly Appropriate,' NBC News (May 16, 2017), https://www.nbcnews.com/politics/white-house/national-security-adviser-mcmastertrump-s-revelations-russians-wholly-appropriate-n760136.

[6]  The statements begin at the 9 minute and 32 second mark of the video.

talked to Mr. Bossert about that, about why he reached out."  *Id.*  Rather than confirming the

media reports, his noncommittal response suggests that he was not involved in, or familiar with,

the alleged outreach, even if it took place.  *Id.*  Unconfirmed reports in the media, even if

widespread, cannot qualify as an official government disclosure.  *See Afshar*, 702 F.2d at 1130

("[E]ven if a fact . . . is the subject of widespread media and public speculation, its official

acknowledgment by an authoritative source might well be new information that could cause

damage to the national security."); *see also Wolf*, 473 F.3d at 378 (explaining that information

must have "been made public through an official and documented disclosure").

Moreover, the media report does not, in any way, confirm or deny whether the NSA or

CIA possess records responsive to the FOIA request.  *See* Pls.' Mem. at 8.  As excerpted in

footnote 5, the media report includes a partial quotation from National Security Advisor

McMaster, as well as a characterization of another comment he purportedly made during the

press conference.  *See id.*  At most, the comments actually relayed in the media report indicate

that the CIA and NSA were recipients of an unsolicited contact from an administration official

that occurred after the meeting.[7]  *See id.*  The comments do not suggest what was said during that

contact or why it was made, other than the vague statement, "out of an overabundance of

caution."  In no way do the comments acknowledge one way or another whether the CIA or NSA

played any role, directly or indirectly, in the May 10 meeting or any briefing of the President.

Simply put, an adviser's decision to "reach out" to the CIA and NSA, even if it occurred, does

not demonstrate that the NSA or CIA had any involvement in the meeting or any pre-meeting

---

[7]  The media report neither mentions the FBI nor claims that the White House reached out to the
FBI following the May 10 meeting.

briefing, or that they possess or do not possess records responsive to Plaintiffs' FOIA request. *See ACLU*, 710 F.3d at 427.

This case is not at all like *ACLU*, on which Plaintiffs exclusively rely.  *See* Pls.' Mem. at 10–12.  In that case, the CIA claimed that it had not been officially acknowledged that the CIA had an intelligence interest in drone strikes, therefore the agency could not reveal whether it has documents related to drone strikes.  The D.C. Circuit rejected this position because the Director of the CIA gave a speech in which he spoke about the precision of targeted drone strikes, the level of collateral damage they cause, and their usefulness in comparison to other weapons and tactics.  Given these specific statements about drone strikes, the D.C. Circuit held that it was not logical or plausible to believe that the CIA did not have an interest in, or any documents related to, drone strikes.  *ACLU*, 710 F.3d at 430–31.  The D.C. Circuit also found that given other official acknowledgements about the United States' participation in drone strikes, it "strain[ed] credulity" to contend that the Central *Intelligence* Agency had no intelligence interest in drones. *Id.* at 430.

Here, in contrast, there have been no statements by the CIA, NSA, or FBI about the President's May 10, 2017 meeting or its substance.  And the White House has not made any statements about those agencies' interest or involvement in that meeting, or in any briefings related to the meeting.  Nor can these agencies' involvement be presumed based merely on the fact that they are part of the intelligence community.  *See* Hardy Decl. ¶ 16; Sherman Decl. ¶ 27; Shiner Decl. ¶ 16.  Accordingly, *ACLU* is not on point, and the agencies' Glomar responses have not been waived.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendants respectfully request that the Court deny Plaintiffs'

motion for partial summary judgment and grant Defendants' cross-motion for partial summary

judgment.

Dated: October 18, 2017                    Respectfully submitted,

                                           CHAD A. READLER
                                           Acting Assistant Attorney General

                                           MARCIA BERMAN
                                           Assistant Director, Federal Programs Branch


                                           */s/ Stephen M. Elliott*
                                           STEPHEN M. ELLIOTT
                                           Trial Attorney
                                           United States Department of Justice
                                           Civil Division, Federal Programs Branch
                                           20 Massachusetts Avenue, N.W., Room 7318
                                           Washington, D.C. 20001
                                           Tel: (202) 305-8177
                                           Email: stephen.elliott@usdoj.gov

                                           Attorneys for Defendants