# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

```
_____
                                        )
JAMES MADISON PROJECT, et al.,          )
                                        )
                Plaintiffs,             )
                                        )
        v.                              )        Civil Action No. 17-1231 (ABJ)
                                        )
CENTRAL INTELLIGENCE                    )
AGENCY, et al.,                         )
                                        )
                Defendants.             )
_____)
```

## MEMORANDUM OPINION

The James Madison Project, an organization concerned with promoting government accountability and reducing secrecy, and Noah Shachtman and Spencer Ackerman, an editor and reporter for the Daily Beast, have brought this suit against the Department of State, the Central Intelligence Agency ("CIA"), the Department of Defense (on behalf of the National Security Agency ("NSA") and Defense Intelligence Agency ("DIA")), and the Department of Justice (on behalf of the Federal Bureau of Investigation ("FBI")) under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552 et seq. Plaintiffs have made FOIA requests for "records memorializing the circumstances surrounding the decision by President Donald J. Trump ("President Trump") to convey classified information to Russian Government officials during a May 10, 2017, meeting in the Oval Office." Compl. [Dkt. # 1] ¶ 10. In response, the CIA, NSA, and FBI each issued what is known as a "Glomar response," refusing to do so much as confirm or deny the existence of

responsive records in the agencies' possession on the grounds that even that information would be covered by a FOIA exemption.[1]  Status Report [Dkt. # 7] ¶ 2.

The parties agreed to litigate the propriety of the three *Glomar* responses before addressing, if necessary, the substantive responses issued by the State Department and DIA.  *Id.* ¶ 4.  Plaintiffs moved for partial summary judgment, arguing that the agencies waived their right to issue *Glomar* responses because the existence of responsive records has already been acknowledged.  Pls.' Mot. for Partial Summ. J. [Dkt. # 8]; Mem. in Supp. of Pls.' Mot. for Partial Summ. J. [Dkt. # 8-1] (collectively, "Pls.' Mot.") at 5–12.  Defendants opposed the motion and filed their own motion for partial summary judgment.  Defs.' Opp. to Pls.' Mot. & Cross-Mot. for Partial Summ. J. [Dkt # 10]; Mem. of P. & A. in Supp. of Defs.' Cross-Mot. [Dkt. # 10-1] (collectively, "Defs.' Cross-Mot").  Upon review of the full record, including the agencies' affidavits and the alleged "official disclosures," the Court will grant the motion for partial summary judgment in favor of the CIA, NSA, and FBI, and it will deny plaintiffs' motion.  This opinion does not address any questions that may arise in connection with the FOIA responses by the State Department or DIA.

## BACKGROUND

On May 22, 2017, plaintiffs filed identical FOIA requests to the CIA, NSA, DIA, FBI, and Department of State.  Ex. 1 to Pls.' Mot. [Dkt. # 8-3] ("FOIA Requests").  The requests sought information related to a May 10, 2017 meeting in which President Trump allegedly shared "sensitive classified information" concerning a terrorist threat with the Russian Foreign Minister

---

1    The term "*Glomar* response" originates from the CIA's refusal to confirm or deny the existence of records in response to a FOIA request relating to "the *Hughes Glomar Explorer*, a ship used in a classified [CIA] project 'to raise a sunken Soviet submarine from the floor of the Pacific Ocean to recover the missiles, codes, and communications equipment onboard for analysis by United States military and intelligence experts.' " *Roth v. U.S. Dep't of Justice*, 642 F.3d 1161, 1171 (D.C. Cir. 2011), quoting *Phillippi v. CIA*, 655 F.2d 1325, 1327 (D.C. Cir. 1981).

and the Russian Ambassador to the United States.  *Id.* at 1.  The requesters sought three categories

of "records created, received and/or maintained" by the five agencies:

> 1) Any documentation – including, but not limited to, transcripts or notes – memorializing the contents of the discussion between President Trump and the two Russian Government officials in the Oval Office on May 10, 2017;
>
> 2) Any documentation relied upon for the purpose of briefing President Trump on the intelligence information that falls within the scope of information referenced in category #1, including, but not limited to, documentation that identified the country that had originally gathered the information; and
>
> 3) Any documentation – including documentation reflecting verbal statements – memorializing the briefing in which President Trump was informed of the intelligence information that falls within the scope of information referenced in category #1, including, but not limited to, documentation that identified the country that had originally gathered the information.

*Id.* at 2.  Plaintiffs specified the relevant time frame of November 8, 2016, to the date of the

agencies' searches.  *Id.*  They advised the agencies that they were "preemptively" arguing that a

*Glomar* response would be improper given remarks made by President Trump and his then-

National Security Advisor, H.R. McMaster, concerning the May 10 meeting.[2]  *Id.* at 3.

None of the defendant agencies provided substantive responses to the FOIA requests, so

plaintiffs filed this suit on June 22, 2017 seeking to compel each agency to respond.  *See* Compl.

Subsequently, the CIA, NSA, and FBI issued *Glomar* responses, informing plaintiffs that "they

can neither confirm nor deny whether they possess responsive materials without revealing

information that is exempt from disclosure by FOIA."  Status Report [Dkt. # 7] ¶ 2.  The DIA

---

2       Plaintiffs asserted in their requests that President Trump's and McMaster's statements disclosed at least three facts: "1) President Trump shared classified information in the May 10, 2017, meeting; 2) President Trump did not mention during the May 10, 2017, meeting that Israel was the original source of the information; and 3) the briefing in which President Trump was informed of the information did not mention the identity of the country that had originally collected the information."  *See* FOIA Requests at 3.

completed its search and informed plaintiffs that it did not identify responsive materials, and the Department of State explained that it needed more time to complete its search. *Id. ¶* 3. The parties agreed to litigate the propriety of the *Glomar* responses before addressing other issues. *Id. ¶* 4.

On September 18, 2017, plaintiffs filed a motion for partial summary judgment, identifying five statements made by President Trump, McMaster, and then-Secretary of State Rex Tillerson, which they argued waived the agencies' right to rely upon *Glomar* responses. Pls.' Mot. at 5–13. Defendants opposed that motion and cross-moved for partial summary judgment asserting that all three agencies properly invoked *Glomar* responses under FOIA Exemptions 1 and 3 and that the FBI response was also justified under FOIA Exemption 7. Defs.' Cross-Mot. at 7–25. The three agencies also argued that none of the statements plaintiffs identified constituted an official acknowledgment of the information sought in plaintiffs' requests. *Id.* at 25–30.

## STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). To defeat summary judgment, the non-moving party must "designate specific facts showing that there is a genuine issue for trial." *Id*. at 324 (internal quotation marks omitted). When the court is presented with cross-motions for summary judgment, it analyzes the underlying facts and inferences in each

party's motion in the light most favorable to the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986).

The mere existence of a factual dispute is insufficient to preclude summary judgment. *Id.*, at 247–48. A dispute is "genuine" only if a reasonable fact-finder could find for the non-moving party; a fact is "material" only if it is capable of affecting the outcome of the litigation. *Id*. at 248; *Laningham v. U.S. Navy*, 813 F.2d 1236, 1241 (D.C. Cir. 1987).

FOIA cases are typically and appropriately decided on motions for summary judgment. *Brayton v. Office of the U.S. Trade Rep.,* 641 F.3d 521, 527 (D.C. Cir. 2011). In FOIA cases, the agency bears the ultimate burden of proof. *See Dep't of Justice v. Tax Analysts*, 492 U.S. 136, 142 n.3 (1989). The Court may award summary judgment based solely on information provided in an agency's affidavits or declarations that identify "the justifications for nondisclosure with reasonably specific detail, demonstrate that the information withheld logically falls within the claimed exemption, and are not controverted by either contrary evidence in the record nor by evidence of agency bad faith." *Military Audit Project v. Casey*, 656 F.2d 724, 738 (D.C. Cir. 1981). These affidavits or declarations are accorded "a presumption of good faith, which cannot be rebutted by 'purely speculative claims about the existence and discoverability of other documents.'" *SafeCard Servs., Inc. v. SEC*, 926 F.2d 1197, 1200 (D.C. Cir. 1991), quoting *Ground Saucer Watch, Inc. v. CIA*, 692 F.2d 770, 771 (D.C. Cir. 1981).

## ANALYSIS

FOIA requires government agencies to release records upon request in order to "ensure an informed citizenry, vital to the functioning of a democratic society, needed to check against corruption and to hold the governors accountable to the governed." *NLRB v. Robbins Tire & Rubber Co*., 437 U.S. 214, 242 (1978). The statute provides that: "each agency, upon any request

for records which (i) reasonably describes such records and (ii) is made in accordance with published rules . . . shall make the records promptly available to any person," 5 U.S.C. § 552(a)(3)(A), unless the records fall within one of nine narrowly construed exemptions. *See* 5 U.S.C. § 552(b); *FBI v. Abramson*, 456 U.S. 615, 630–31 (1982). This framework "represents a balance struck by Congress between the public's right to know and the government's legitimate interest in keeping certain information confidential." *Ctr. for Nat'l Sec. Studies v. DOJ*, 331 F.3d 918, 925 (D.C. Cir. 2003), citing *John Doe Agency v. John Doe Corp.*, 493 U.S. 146, 152 (1989). When an agency withholds documents or parts of documents, it must explain what it is withholding and specify the statutory exemptions that apply. *See Vaughn v. Rosen,* 484 F.2d 820, 825–28 (D.C. Cir. 1973).

In some instances, however, the government may refuse to even confirm or deny the existence of responsive records. *Wolf v. CIA*, 473 F.3d 370, 374 (D.C. Cir. 2007). This is called a "*Glomar* response." *Id.* Such a response is appropriate when revealing the fact that an agency possesses responsive records would itself "cause harm cognizable under [a] FOIA exception." *Id.*, quoting *Gardels v. CIA*, 689 F.2d 1100, 1103 (D.C. Cir. 1982) (internal quotation marks omitted).

To justify a *Glomar* response, the agency must supply the court with a detailed affidavit that explains why it cannot provide a substantive response pursuant to a FOIA exemption. *Elec. Privacy Info. Ctr. v. NSA*, 678 F.3d 926, 931 (D.C. Cir. 2012). To determine whether a *Glomar* response "fits a FOIA exemption, courts apply the general exemption review standards established in non-*Glomar* cases." *Wolf*, 473 F.3d at 374.

I.    **Defendants' *Glomar* responses are justified under FOIA Exemptions 1 and 3.**[3]

The FOIA requests at issue here deal with whether the President received certain "sensitive classified information," and whether he shared it with foreign officials.   Under those circumstances, plaintiffs do not challenge the applicability of FOIA Exemptions 1 and 3, which authorize government agencies to withhold information that is classified to protect national security and information that may not be disclosed under another federal law.  But since an agency bears the burden of proving that a FOIA exemption applies, *Tax Analysts*, 492 U.S. at 142 n.3, and defendants have moved for summary judgment on this issue as a matter of law, the Court will briefly address the undisputed validity of these exemptions.

FOIA Exemption 1 provides that matters that are "specifically authorized under criteria established by an Executive [O]rder to be kept secret in the interest of national defense or foreign policy and . . . are in fact properly classified pursuant to such Executive [O]rder" are exempt from production under FOIA. 5 U.S.C. § 552(b)(1). "[I]n the FOIA context, [the D.C. Circuit has] consistently deferred to executive affidavits predicting harm to the national security, and have found it unwise to undertake searching judicial review."  *Ctr. for Nat'l Sec. Studies*, 331 F.3d at 927. "The [agency's] arguments need only be both 'plausible' and 'logical' to justify the invocation of a FOIA exemption in the national security context." *ACLU v. U.S. Dep't of Def.*, 628 F.3d 612, 624 (D.C. Cir. 2011) ("*ACLU I*"), quoting *Wolf*, 473 F.3d at 374–75; *see also Morley v. CIA,* 508 F.3d 1108, 1124 (D.C. Cir. 2007) ("[T]he text of Exemption 1 itself suggests that little proof or explanation is required beyond a plausible assertion that information is properly classified."). The D.C. Circuit has advised courts to accord substantial deference to an

---

3       The FBI also invoked FOIA Exemption 7(A) and 7(E).  Decl. of David M. Hardy [Dkt. # 10-2] ("FBI Decl.") ¶¶ 33–45.  Because the Court has found that its *Glomar* response was proper under FOIA Exemptions 1 and 3 it need not analyze whether it was also proper under Exemption 7.

agency's *Glomar* response when the information requested "implicat[es] national security, a uniquely executive purview." *Elec. Privacy Info. Ctr.*, 678 F.3d at 931, quoting *Ctr. for Nat'l Sec. Studies*, 331 F.3d at 926–27.

Here, the three agencies' declarants aver that the question of whether or not these agencies have responsive records is itself a classified fact that is protected by Executive Order and that disclosure of this fact could pose a risk to national security. The agencies all rely on Executive Order 13,526 which protects from disclosure classified information concerning "intelligence activities (including covert action), intelligence sources or methods, or cryptology." *See* Decl. of David M. Hardy [Dkt. # 10-2] ("FBI Decl.") ¶ 20, quoting Exec. Order No. 13,526 ("E.O. 13,526"), 75 Fed. Reg. 707 (Dec. 29, 2009); *see also* Decl. of Antoinette B. Shiner [Dkt. # 10-4] ("CIA Decl.") ¶ 20; Decl. of David J. Sherman [Dkt. # 10-3] ("NSA Decl.") ¶ 22.

As to whether the requested information could reasonably be expected to damage national security, the FBI declarant avers:

> Specifically, an official FBI acknowledgment that confirms or denies the existence or nonexistence of responsive FBI records would indicate the FBI's involvement in collecting, analyzing, and/or disseminating intelligence regarding the terror plot described in Plaintiffs' FOIA request. It would also reveal the existence or nonexistence of an FBI intelligence interest in the May 10th meeting, as well as intelligence sources and methods related to the collection of intelligence from diplomatic meetings generally. This would reveal classified and statutorily-protected information.

FBI Decl. ¶ 20; *see also id* ¶¶ 26, 28.

The NSA declarant similarly avers that confirming whether responsive records exist within the agency's files is a classified fact because disclosure "would permit the public at large to determine information concerning the focus and direction of the NSA's intelligence efforts, as well as its capabilities, sources, and methods," and it "would disclose at minimum, that [signal

intelligence],'" was or was not involved in the discussions that took place at the May 10th meeting. NSA Decl. ¶ 9; *see also id.* ¶¶ 18, 26.

Finally, the CIA declarant avers that a *Glomar* response is justified under Exemption 1 because:

> It would be alerting and possibly alarming for foreign countries to learn that CIA was somehow involved or interested in specific diplomatic meetings, signaling to both the diplomats and the world that there was something about the diplomatic meeting that warranted CIA involvement.  Here, for example, acknowledging the existence of records responsive to [p]laintiffs' FOIA request would tend to reveal that CIA actually participated in the White House meeting with the Russian diplomats; used the meeting to obtain intelligence from or about the Russian officials; had an intelligence interest in, information about, or relationship with the Russian officials; and/or had an intelligence interest in the topic discussed at the meeting, including alleged discussions about intelligence information allegedly provided by Israel about an alleged terrorist threat related to the use of laptop computers on commercial flights.

CIA Decl. ¶ 22.  And on the other hand, "if it were disclosed that CIA was not involved or interested in a particular meeting with a foreign diplomat, then it would signal to the diplomat that his or her activities or the topics discussed were not of interest to CIA," which could be "problematic if, for example, the foreign diplomat is clandestinely engaging in intelligence-related activities because it would suggest that his or her activities have gone undetected by CIA activities, as it would indicate."  *Id*.

After examining the declarations submitted by the three agencies in support of their motion, the Court is satisfied that they have put forth a "plausible" and "logical" argument in support of their *Glomar* responses under FOIA Exemption 1.  *ACLU I,* 628 F.3d at 624.

Defendants also argue that the information is properly withheld under FOIA Exemption 3. *See* FBI Decl. ¶¶ 31–32; NSA Decl. ¶¶ 31–36; CIA Decl. ¶¶ 27–28.  FOIA Exemption 3 permits an agency to withhold records that are "specifically exempted from disclosure by statute,"

provided that the statute either "requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue; or establishes particular criteria for withholding or refers to particular types of matters to be withheld." 5 U.S.C. § 552(b)(3). Because each agency's declaration both identifies the statute that excludes the information and establishes that the information falls within the statute's scope, the Court finds that FOIA Exemption 3 was properly invoked.[4]  *See Goland v. CIA*, 607 F.2d 339, 350 (D.C. Cir. 1978) (holding that in FOIA Exemption 3 cases "the sole issue for decision is the existence of a relevant statute and the inclusion of withheld material within that statute's coverage").

## II.   **Defendants have not waived their right to issue *Glomar* responses.**

### A.   **The Official Acknowledgment Doctrine**

It is well established that a FOIA plaintiff may compel disclosure of information "even over an agency's otherwise valid exemption claim" if the government previously "officially acknowledged" the information.  *ACLU I*, 628 F.3d at 620.  The rationale behind the doctrine is that once information has become public, any harm the agency fears from disclosure has already been sustained.  *See Niagara Mohawk Power Corp. v. U.S. Dep't of Energy,* 169 F.3d 16, 19 (D.C. Cir. 1999).  This is commonly referred to as an "official acknowledgment" challenge or the "public domain exception."  *See ACLU v. CIA*, 710 F.3d at 422, 426–27 (D.C. Cir. 2013) ("*ACLU II*") (using the terms interchangeably).

---

[4]     The NSA points to the National Security Agency Act, 50 U.S.C. § 3605(a), the Intelligence Reform and Terrorism Prevention Act, 50 U.S.C. § 3024(i)(1), and 18 U.S.C. § 798.  *See* NSA Decl. ¶¶ 32–34.  The FBI and CIA both point to the National Security Act, 50 U.S.C. § 3024(i)(l) (formerly codified at 50 U.S.C § 403-1(i)(l)).  *See* FBI Decl. ¶¶ 31–32; CIA Decl. ¶¶ 27–28.

A plaintiff mounting this type of challenge "must bear the initial burden of pointing to specific information in the public domain that appears to duplicate that being withheld." *Afshar v. Dep't of State,* 702 F.2d 1125, 1130 (D.C. Cir. 1983).

The D.C. Circuit has established a "strict test" to be applied to claims of official disclosure. *Moore v. CIA*, 666 F.3d 1330, 1333 (D.C. Cir. 2011). Information is officially acknowledged by an agency where: (1) "the information requested [is] as specific as the information previously released," (2) the requested information "match[es] the information previously disclosed," and (3) the requested information was already "made public through an official and documented disclosure." *Fitzgibbon v. CIA*, 911 F.2d 755, 765 (D.C. Cir. 1990).

In *Glomar* cases, a plaintiff need not show that that the contents of the requested records have been disclosed; rather, consistent with the nature of the exemption being invoked, the plaintiff must establish that the agency has previously acknowledged the fact of the "existence" of responsive records. *Marino v. DEA*, 685 F.3d 1076, 1081 (D.C. Cir. 2012).

The D.C. Circuit has articulated the official acknowledgment test in *Glomar* cases as follows:

> [I]f the prior disclosure establishes the *existence* (or not) of records responsive to the FOIA request, the prior disclosure necessarily matches both the information at issue – the existence of records – and the specific request for that information.

*Wolf*, 473 F.3d at 379 (emphasis in original). This standard has been reaffirmed by the D.C. Circuit in subsequent *Glomar* cases. *See Moore*, 666 F.3d at 1333 (holding that a plaintiff must "pinpoint an agency record that both matches the plaintiff's request and has been publicly and officially acknowledged by the agency"); *see also Mobley v. CIA*, 806 F.3d 568, 583 (D.C. Cir. 2015) (restating the three-part *Fitzgibbon* official acknowledgment test).

The D.C. Circuit has repeatedly emphasized the importance of applying this test narrowly, because "the fact that information exists in some form in the public domain does not necessarily mean that official disclosure will not cause harm cognizable under a FOIA exemption." *Wolf,* 473 F.3d at 378, citing *Fitzgibbon,* 911 F.2d. at 766.   Therefore, "[p]rior disclosure of similar information does not suffice; instead, the *specific* information sought by the plaintiff must already be in the public domain by official disclosure." *Morley,* 508 F.3d at 1124 (emphasis in original). And in cases involving FOIA Exemption 1, "[t]he insistence on exactitude recognizes 'the Government's vital interest in information relating to national security and foreign affairs.'" *Id.*

If a court determines that a *Glomar* response has been waived because the information was previously officially acknowledged, then the government must either:  "(1) disclose the record to the requester or (2) establish that its contents are exempt from disclosure and that such exemption has not been waived." *Moore*, 666 F.3d at 1333.  In other words, a failed *Glomar* response "does not mark the end" of a case.  *ACLU II,* 710 F.3d at 432.  Instead, the case is remanded to the agency to process the FOIA request and assert any exemptions to disclosure on a document-by-document basis.  *Wolf,* 473 F.3d at 379–80.

### B.     The Public Statements

To overcome defendants' *Glomar* responses, plaintiffs point to five public statements made by President Trump, the National Security Advisor at the time, H.R. McMaster, and the then-Secretary of State, Rex Tillerson.

### i.     May 15, 2017 McMaster Press Statement

Plaintiffs first cite to remarks McMaster made at a press conference on May 15, 2017 following news reports that President Trump had allegedly disclosed sensitive classified

information to senior Russian officials at a White House meeting on May 10, 2017.  Pls.' Mot. at

7.  McMaster stated:

> There's nothing that the president takes more seriously than the security of the American people.  The story that came out tonight, as reported, is false.  The president and the foreign minister reviewed a range of common threats to our two countries, including threats to civil aviation.  At no time – at no time – were intelligence sources or methods discussed.  And the president did not disclose any military operations that were not already publicly known.  Two other senior officials who were present, including the secretary of state, remember it being the same way and have said so.  Their on-the-record accounts should outweigh those of anonymous sources.  And I was in the room.  It didn't happen.

*Id.*[5]

    ii.    <u>May 15, 2017 Tillerson Press Statement</u>

Next, plaintiffs note that Tillerson issued a press statement that same day, echoing

McMaster's remarks regarding the May 10 meeting:

> During President Trump's meeting with Foreign Minister Lavrov a broad range of subjects were discussed among which were common efforts and threats regarding counter-terrorism.  During that exchange, the nature of specific threats were discussed, but they did not discuss sources, methods or military operations.

Pls.' Mot. at 7.[6]

    iii.    <u>May 16, 2017 Statements by the President on Twitter</u>

Plaintiffs also rely on a two-part tweet about the May 10 meeting which the President

posted on May 16, 2017:

---

5    Citing, Aaron Blake, *The White House isn't denying that Trump gave Russia classified information — not really*, Wash. Post (May 15, 2017), https://www.washingtonpost.com/news/the-fix/wp/2017/05/15/the-white-house-isnt-denying-that-trump-gave-russia-classified-information-not-really/?utm_term=.42063524b636.

6    Citing, Michelle Kosinski & Nicole Gaouette, *State Dept. left in the dark about Tillerson statement on Post's Trump report*, CNN (May 15, 2017, 9:05 PM), https://www.cnn.com/2017/05/15/politics/tillerson-statement-trump/index.html.

As President I wanted to share with Russia (at an openly scheduled W.H. meeting) which I have the absolute right to do, facts pertaining . . .

* * *

. . . to terrorism and airline safety.  Humanitarian reasons, plus I want Russia to greatly step up their fight against ISIS & terrorism.

Pls.' Mot. at 7–8.[7]

iv.   May 16, 2017 McMaster Press Conference

Plaintiffs point to the statements McMaster made at another press briefing on May 16, 2017 that was reported on by NBC news.  Pls.' Mot. at 8.[8]  The online article plaintiffs cite to includes a video clip of the press conference in which a news reporter asked McMaster, "Are you denying that he revealed information that was given to the U.S. by an intelligence partner?"  NBC article. McMaster responded:

So what we don't do is discuss what is and isn't classified. What I will tell you, is in the context of that discussion, what the President discussed with the foreign minister was wholly appropriate to that conversation and is consistent with the routine sharing of information between the President and any leaders with whom he's engaged.

Id.

When pressed on the same point, McMaster replied, "I'm not going be the one to confirm that sort of information that could jeopardize, that could jeopardize our security." Id.  The reporter then asked whether McMaster was concerned that other intelligence partners would stop sharing

---

7      Citing, Peter Baker & Julie Hirschfeld Davis, *Trump Defends Sharing Information on ISIS Threat With Russia*, N.Y. Times (May 16, 2017), https://www.nytimes.com/2017/05/16/us/politics/trump-intelligence-russia-classified.html?_r=0 (featuring the President's two-part tweet) ("N.Y. Times Article").

8      Citing, Ali Vitali & Ken Dilanian, *National Security Advisor McMaster: Trump's Revelations to Russians 'Wholly Appropriate'*, NBC News (May 16, 2017, 3:54 PM), https://www.nbcnews.com/politics/white-house/national-security-adviser-mcmaster-trump-s-revelations-russians-wholly-appropriate-n760136 ("NBC Article").

information with the United States.  *Id.*  McMaster responded, "No I am not concerned at all. That conversation was wholly appropriate to the conversation.  And I think wholly appropriate what the expectations are of our intelligence partners."  *Id.*

Aside from the video clip, the news article also attributes the following quotes to McMaster regarding the May 10 meeting:

- "I was in the room, the Secretary of State was in the room, as you know, the deputy adviser for national security, Dina Powell, and none of us felt in any way that conversation was inappropriate."

- "[The President] wasn't aware of where this came from.  He wasn't briefed on the source of this information."

*Id.*

The article also reports that McMaster confirmed that President Trump disclosed the city in ISIS-held Syria where the intelligence emanated from and quotes McMaster saying, "It was nothing that you would not know from open-source reporting."  *Id.*  Finally, the article states that Homeland Security Adviser Tom Bossert reached out to the CIA and NSA in the aftermath of the May 10 meeting.  *Id.*  The news article quotes McMaster saying that Bossert likely did so out of "an overabundance of caution," although the next line of the article reports that McMaster added that he did not know why Bossert reached out.  *Id.*

v.   <u>May 22, 2017 President Trump Press Statement</u>

Finally, plaintiffs point to a May 22, 2017 statement President Trump made while at a press appearance in Israel.  Pls.' Mot. at 8.  Following news reports that Israel was the intelligence partner that provided the classified information President Trump allegedly shared with the Russians during the May 10 meeting, the President said:

> I never mentioned the word or the name Israel. Never mentioned it during our conversation.

*Id.*[9]

### C.      Plaintiffs have not met the strict official acknowledgment test.

In their FOIA request, plaintiffs sought three categories of records.  The first item called for records "memorializing the contents of the discussion between President Trump and the two Russian Government officials in the Oval Office on May 10, 2017."  *See* FOIA Requests at 2. None of the statements made by President Trump, McMaster, or Tillerson explicitly acknowledge that either the CIA, NSA, or FBI has records "memorializing the contents" of the May 10 meeting. Indeed, not a single public statement mentions *any* record related to the May 10 meeting, much less the "transcripts or notes" plaintiffs specifically requested.  *Id.*

The McMaster and Tillerson statements from May 15, and the President's tweet on May 16, simply describe the meeting with the Russians in very broad terms.  At most, they confirm that the meeting took place and that common threats, including issues related to civil aviation and ISIS were discussed.  While the President appeared to acknowledge in his May 16 tweet that he communicated with the Russians about "terrorism and airline safety," N.Y. Times Article, and he later denied rumors that he had mentioned "Israel," ABC Article, his statements do not necessarily confirm the existence of records memorializing the May 10 conversation, and they certainly do not reveal or imply that any of the three agencies created or retain such records.

On May 16, McMaster provided another general overview, characterizing the President's disclosures as "wholly appropriate."  *See* NBC Article.  The press report from that date reflects that he added a little more detail, as he disclosed that his Deputy Advisor for National Security, Dina Powell, as well as then-Secretary of State, Rex Tillerson, were in the room.  *Id.*  While these

---

9      Citing, Katherine Faulders et. al., *Trump: 'I never mentioned' Israel to Russian officials in Oval Office Meeting*, ABC News (May 22, 2017, 2:12 PM), https://abcnews.go.com/ Politics/trumpmeet-israeli-palestinian-leaders-separately/story?id=47545023 ("ABC Article").

statements may provide grist for speculation that the State Department or the Executive Office of the President memorialized the meeting in some way, they do not expressly acknowledge that possibility, and they do not bear on the agencies at issue here.

The only specific reference to any of the agencies advancing the *Glomar* response was made when McMaster reportedly confirmed in the May 16, 2017 press conference that Homeland Security Adviser Tom Bossert had reached out to the CIA and NSA following the May 10 meeting out of a "an overabundance of caution."  NBC Article.  McMaster added that he did not know why Bossert contacted the agencies.  This vague acknowledgment of some type of post-meeting communication between Bossert and the CIA and NSA does not expressly mention any particular record, nor does it reveal – explicitly or implicitly – that either of the agencies retains records memorializing the May 10 meeting.  So the claimed official acknowledgments do not match the first item of plaintiffs' FOIA requests.  *See Wolf*, 473 F.3d at 378–79.

Plaintiffs argue that the individual agencies' *Glomar* responses are unsustainable because "the U.S. Government writ large . . . has already acknowledged its obvious interest in the May 10, 2017 Oval Office meeting."  Pls.' Reply in Supp. of Mot. [Dkt. # 11] ("Pls.' Reply") at 5.  They submit – based simply on the fact that the meeting occurred – that surely some documents must exist.  *Id.*  And they posit that the NSA, FBI, and CIA must possess those documents given the sensitive nature of the topics discussed and the fact that the CIA and NSA are intelligence agencies, and the FBI is the "country's law enforcement agency."  Pls.' Mot. at 11; Pls.' Reply at 5.  But that, of course, does not begin to meet the "strict" official acknowledgment test, which demands that the information disclosed "match[ ]" plaintiffs' request.  *Moore*, 666 F.3d at 1333.

FOIA does not treat the executive branch as a unified entity, and not one of the public statements proffered by the plaintiffs touches upon the FBI in any way.  Nor does any statement

confirm any relationship between the CIA or the NSA and the meeting.  The Court cannot speculate that specific documents exist within individual agencies based on general pronouncements in the public domain, or the fact that "the U.S. Government" had an "interest" in a matter that came up at the meeting.  *See Wolf*, 473 F.3d at 379; *Morley,* 508 F.3d at 1124.  To do so would violate the strict requirements of the official acknowledgment doctrine which demands "exactitude," particularly in cases like this one where national security and foreign affairs are involved.  *Morley,* 508 F.3d at 1124.  Because plaintiffs have failed to meet that burden, the Court finds that none of the public statements constitute official acknowledgments that waived defendants' *Glomar* responses to the requests related to the May 10 meeting.

With respect to the second and third items in the FOIA requests, both call for records related to information that may have been transmitted, or a briefing that may have occurred, prior to the President's May 10 meeting with the Russian officials.  *See* FOIA Requests at 2.  But none of the public statements expressly acknowledge the existence of records concerning a pre-meeting briefing or, more important, any role played by the three agencies advancing the *Glomar* responses.

While a news account of McMaster's May 16, 2017 press conference reported that the National Security Advisor confirmed that the President had named the city in Syria from which the intelligence he shared emanated, it also noted that McMaster added, "[i]t was nothing that you would not know from open-source reporting."  NBC Article.  McMaster is quoted as saying that the President "wasn't aware of where this came from. He wasn't briefed on the source of this information." *Id.*

Plaintiffs infer from this statement that a briefing must have taken place: "[i]t borders on axiomatic that Mr. McMaster's statements that President Trump had not been briefed on the identity of the intelligence-gathering partner also stands for the idea that President Trump *had* been

briefed (in some manner) in advance of the May 10, 2017, meeting." Pls.' Mot. at 11. (emphasis in original). Maybe so. But that is not the point. Even if one were to draw an inference from this isolated statement that that the President was "briefed" about *something*, McMaster's description of the limits of the President's knowledge does not open the door to a fishing expedition into which, if any, of the three defendant agencies that has raised undisputed national security concerns participated in a briefing, or created or retained materials related to its subject matter. That is precisely the information the agencies have plausibly argued is exempt, and McMaster's denial has not in any way exposed it to public view.

Because none of the public statements expressly acknowledge the existence of a pre-meeting briefing, much less that these agencies may possess specific documents that were relied upon or were generated as a part of it, the Court finds that the public statements do not "match" the second and third items of the FOIA request either. *See Wolf,* 473 F.3d at 378.

In an effort to forestall the entry of judgment in the defendants' favor, plaintiffs argue that the D.C. Circuit's ruling in *ACLU v. CIA,* 710 F.3d 422 (D.C. Cir. 2013) relaxed the official acknowledgment test and established some "latitude" in *Glomar* cases. Pls.' Reply at 2. Plaintiffs misconstrue the narrow holding in *ACLU II* and ignore subsequent precedent that reaffirms the strict application of the "matching" and "specificity" requirements of the official acknowledgment doctrine in the *Glomar* context. While the Court in *ACLU II* did infer the existence of records, even when none were expressly mentioned in the public statements themselves, it did so based on a narrow set of circumstances that are not applicable here. 710 F.3d at 430.

In *ACLU II,* the plaintiffs sought the release of records from the CIA regarding the operation of drones by the CIA and the Armed Forces. 710 F.3d at 425. The agency issued a *Glomar* response in order to avoid confirming or denying whether the agency had an "interest" in

drones.  *Id.* at 427.[10]   In rejecting the *Glomar* approach, the Court pointed to a number of statements, including comments made by the President and a national security advisor, as well as a speech made by the Director of the CIA.  *Id.* at 429–31.   Based on that combination of public revelations, it concluded that the government had already disclosed enough to demonstrate that it must be in possession of responsive records.  *Id.* at 430

The Court placed particular emphasis on public statements made by the CIA itself.  It found that contrary to the agency's assertions, the CIA had already disclosed its "interest" in drones:

> [T]he Director spoke directly about the precision of targeted drone strikes, the level of collateral damage they cause, and their usefulness in comparison to other weapons and tactics. Given those statements, it is implausible that the CIA does not possess a single document on the subject of drone strikes. Unless we are to believe that the Director was able to "assure" his audience that drone strikes are "very precise and . . . very limited in terms of collateral damage" without having examined a single document in his agency's possession, those statements are tantamount to an acknowledgment that the CIA has documents on the subject.

*Id.* at 431.  Thus, under those unique circumstances, the Court found that it was "neither logical nor plausible to maintain that the Agency does not have any documents relating to drones."  *Id.* (internal quotation marks omitted).

Here, by contrast, the FBI, NSA, and CIA have not issued public statements related to the May 10 meeting.   Nor do any of the public statements listed by the plaintiffs reveal their involvement in the meeting, or in preparing for the meeting.   Therefore, the Court finds that it is entirely plausible that either confirming or denying whether the NSA, FBI, or CIA have an interest or involvement in the May 10 meeting could reasonably damage national security notwithstanding

---

10     The CIA also issued the *Glomar* response to avoid disclosing whether it had an "involvement" in drone strikes.  *ACLU II*, 710 F.3d at 427.  The Court rejected this part of its justification by concluding that the agency had "proffered no reason to believe that disclosing whether it has any documents at all about drone strikes will reveal whether the Agency itself – as opposed to some other U.S. entity such as the Defense Department – operates drones."  *Id.* at 428.

the general accounts of the meeting made by other public officials. *See Fitzgibbon,* 911 F.2d at 763, quoting *Gardels,* 689 F.2d at 1106 ("We must take into account . . . that each individual piece of intelligence information, much like a piece of jigsaw puzzle, may aid in piecing together other bits of information.").

Moreover, since *ACLU II,* the D.C. Circuit has reaffirmed the need to satisfy both the specificity and matching requirements in the *Glomar* context. In *Mobley*, a *Glomar* case, the D.C. Circuit re-stated that a "three-part test determines whether an item is 'officially acknowledged,'" and it went on to quote the matching and specificity requirements articulated in *Fitzgibbon.* 806 F.3d at 583. Plaintiffs' suggestion that *ACLU II* upended the long-standing requirements of the official acknowledgment doctrine is therefore without legal support.

## CONCLUSION

The Court will grant defendants' motion for partial summary judgment because the agencies supported their *Glomar* responses under FOIA Exemption 1 and 3 with uncontroverted declarations, and significant deference is given to agencies when the information requested implicates national security. *See Elec. Privacy Info. Ctr.*, 678 F.3d at 931. Because plaintiffs have not supplied any statements that constitute official acknowledgments of the existence of the records requested, the *Glomar* responses issued by the CIA, NSA, and FBI will stand and the Court will deny plaintiffs' motion for partial summary judgment.

A separate order will issue.

AMY BERMAN JACKSON
United States District Judge

DATE:  September 26, 2018